And our next case for argument on the docket is Tofsrud v. City of Spokane Did you find the button? There's a button on that side of the podium that will lower Good morning. My name is Jeffrey Feiner. I'm the attorney for Lonnie Tofsrud. I'm bringing the case today before you, representing Mr. Tofsrud, asking the Court to reverse the trial court's dismissal. Could you speak up and speak directly into those mics? Directly. Asking the Court to reverse the trial court's grant of summary judgment in the case of Mr. Tofsrud against the City of Spokane and its police department. The issues resonate somewhat in the previous case, but I would like to focus strictly on the early facts and a timeline, because I think the Court's decision is going to be turned on the timeline of events as they unfolded in 2017. The plaintiff in this case is a 28-year veteran detective with the City of Spokane. He's tasked to alcohol, tobacco, and firearms and works with a number of informants in his work. He learned in November of 2017 that one of his informants had been arrested in a traffic stop in the outskirts of Spokane, and he obtained the CAD, which is the Computer Aided Dispatch Records, and the police report outlining the arrest. On examination, he noticed that there was no comparison, that the CAD and the police report authored by Corporal McCullough were not remotely in agreement. When he approached the prosecutor, Cruz, I think, with this information, would it be fair to say that at least in part the reason he did that was to protect his CI? At that point, he couldn't, and I don't think it was more than a passing concern. The record doesn't say he was trying to protect his informant. But let me give you the timeline so that it's more evident why my answer is responsive to your question. Detective Tosford went to the CI almost immediately after learning of his arrest, and he says he went with ATF agent, Special Agent Julius, because they had to salvage and deal with the cases where this gentleman would be testifying. That was in November. Seven weeks later, he goes to Detective Cruz. At that point, Your Honor, the fallout from the CI's arrest is dealt with. The record shows many of the cases had been adjudicated, some had not. But salvaging the CI was not Detective Tosford's concern. He does say that he is interested in trying to do a free talk in November with the CI. And the free talk with the CI who has been arrested for a weapons charge is largely to figure out, well, is there anyone else who was present at other events? Can you give us other leads? Because you're washed out. You cannot testify. We're not working with you further. So he does try to salvage in November. Weeks later, seven weeks later, in the end of December of 2017, Detective Tosford goes to his sergeant, Pruninger. He says, Sergeant, look at this. Do you see what I'm seeing? And Sergeant Pruninger, in the records very clear in both opening and reply brief, looks at this and says, oh, my God, they hid the fact they had an informant. They suggested this was a random license check. It was a stakeout. It was written in a way to divert any attention to the investigation that was ongoing against Mr. Tosford's, Detective Tosford's CI, and presented like it was just happenstance. Sergeant Pruninger says, this is, I hate this. I'm done bashing my head against this wall. I'm not touching it. Mr. Tosford goes and speaks, Detective Tosford goes and speaks with Corporal McCullough and says, look, dude, your CAD doesn't match your report. Which one is right? Corporal McCullough says the CAD is correct. Corporal McCullough says, so you should go get those charges dismissed. And Detective Tosford says, it's your job. You've got to do that. I'm not in the case. He has no stake in the case. Disquieted and mindful of a long history in this department of this particular unit. So at this point in the timeline that you're describing, your client had been told by a supervisor that it was his job to see that these charges were dismissed? No, the corporal who misled in the report said, I'm not doing it. That's your job. Detective Tosford thought, no, you have to fix this. I'm not in this case. I'm in the TCU. You're in PACT. You've got to fix this. My client goes to his sergeant again, chain of command, describes the encounter with the corporal. Sergeant says, I'm done. I'm not touching it. Detective Tosford now has no further channel in the chain of custody. His sergeant said, I'm done bashing my head. I thought his sergeant said it was okay for him to go talk to Cruz. He does. Tosford says, I'm of a mind to go to Detective Cruz. The sergeant does not order him to. He says, that's fine. I agree. But does not order him. Now, the formal procedure would have been to write a complaint and submit it to IA or to the PACT supervisor. That's Lieutenant Staben. Are you arguing that in order for it to be within the scope of his employment, he has to be ordered to do it? No. It has to be within his duties. And there is nowhere in this record, unlike the record in opposing counsel's citation to supplemental authority, there is nothing in this record that says that a police officer in Spokane has a duty to go to a prosecutor and say a brother officer, a sister officer, has lied in a report or fabricated a report or been dishonest, whatever word is chosen. That is not a duty that's written out. And, in fact, Judge, and with respect to this difficult problem, here's what Spokane City said. They said Detective Tosford's going to the prosecutor to say, you have a dirty file, that that was unsolicited. So, Judge, apparently City of Spokane thinks you must be asked to inform and whistleblow. They said unsolicited and reckless. It was reckless because Detective Tosford didn't ask Mr. or Corporal McCullough, geez, did someone tell you to fabricate this? Turns out, Corporal McCullough says, oh, I was instructed to fabricate this by the prosecutor. Nothing in the record supports that, but that's what the gentleman says. The record does support that the City of Spokane hierarchy in the police department said that it was fine to do. McCullough was absolutely right to do what he did. It was fine to change the police report so that it would not reflect the actual facts in the computer aided. I thought the record in this case reflects that your client wanted to save his cases. He said it in that words. Let me go to that in a moment because that's a little later in the timeline. He does. He uses those very words. And bear with me because I'm almost there in the timeline, and I want to show why this matters. Judge, I promise you to satisfaction. It will turn on whether an employee subjectively determines their duties or the employer determines the duties. The opposition in this case argues, without ever saying this, that the employee determines the scope of their duties. Now, I know the second restatement on agency is not briefed in this case, but it is not a correct proposition of law that employees subjectively determine their duties. The duties are written down or formed by policy or practice or custom, but not by a detective who decides what his duties are. No one's ever said such a thing. So when he goes to cruise, he's told in retaliation that was unsolicited, it was reckless, and it was inappropriate, and he is dismissed from his unit. He's sent to an outside precinct, put in a desk next to where the Department of Corrections inmates give their urine samples. He's taken off all of his 27 years of work. And that sends the signal to the Spokane Police Department, do not whistleblow. You must come up through your chain of command. His chain of command was Pruninger, who said I wasn't going to touch it, or Staben, who was the gentleman, forgive me, I'm going to quote him. He said, anyone fucks with my group, I will hurt them. Now, that's the situation. So when he goes to cruise, he's reporting maybe as Lonnie Tosford subjectively. But the question isn't what he subjectively wanted, it's what his duties were. There is no duty to go to the prosecutor. Is that a question of fact? I mean, so is there a dispute of fact regarding the facts relevant to what his job includes and doesn't? Yes. Or are the facts set and we're just trying to figure out what they mean? Well, there is one fact question that has been brought up twice from the bench, and that is what was Lonnie Tosford doing when he said, I was trying to save the cases? And I will address that now that I've set the stage for whether he can subjectively make this decision. The actual sequence when he goes, he says in the – and if I may, I'm going to turn actually to the transcript. This is the report he made to the investigating agency when he was being And the sequence goes, he's talking with his sergeant. They are discussing whether he goes. And then he's asked later why he went. In that context, and forgive me because I've turned too many pages, let me just get it for a moment. I'll use my time for that. All right. At the record at page 179, he describes that he went to a free talk with his confidential informant. This is in November, early on. He and Julius, to save their cases, to figure out what to do with them, they do a free talk. Was a prosecutor present? No. This was Detective Tosford, the arrested CI, and the CI's lawyer. It goes on next to say, okay, all right. So these questions were listed out by Lieutenant Staben. I want to know why did you decide to talk to Cruz? And Detective Tosford says, for the reasons I just told you. And if you look at the page 179, the reasons were why he did the free talk. Why he did the free talk with the confidential informant. To salvage any cases this guy helped us with. And to make sure we didn't violate any of his rights. Okay. So my question was, is this a case of disputed facts, or is this a case of what is the legal import of the undisputed facts? I think your answer is the disputed fact is his intent. Yes. In communicating with the DA. That's correct. So here's my question. Yes. What case says that we should care about his intent, as opposed to the actual physical facts or the actions that occurred? I know of no case that says the intent controls whether someone is speaking as a uniformed officer, or whether they're speaking in order to advance as a citizen. I do know that in the Bowler case, that gentleman signed his official capacity to the affidavit. He wrote down he was the captain of the police. And the court in Bowler said, well, that wasn't using his rank. He wasn't reporting as the captain. That was showing how he had such clear control and a grip on the facts, that he was the captain. That's why he knew. It was providing the basis for his information and his knowledge. In this instance, Mr. — excuse me, Detective Tosfred cannot determine what the scope of his duties are, and nowhere are his duties to go to a cruise. And we know this because he was reprimanded for going to cruise. Well, is that right? Because, I mean, officer — detectives working up cases often talk to the DA. So it's not accurate that talking with the DA is outside the scope of his job. Every day they talk to one another. But there's no duty that he go on a case that's not his and go to cruise and say, we have a problem here. That's not in his duties. How do we know that? Because the city of Spokane determines his duties, and the city of Spokane said, you broke the chain of command, which I don't think he did. He went to his sergeant. His sergeant said it wasn't going to do anything. And you were unsolicited. I'm not making up their duties, and Detective Tosfred cannot make up his duties. The city of Spokane determines his duties. That's authoritative, Your Honor. Do you want to save any time for Spokane? I do. One minute. Thank you. Thank you, Your Honors. May it please the Court. Taki Flavaris of Pacifica Law Group on behalf of the city defendants in this case. Your Honors, as the Supreme Court held in Garcetti, the First Amendment does not insulate public employees from oversight or discipline for communications they engage in in the course of their job. There may be other legal limits that apply, such as whistleblower laws, which were referenced, but that type of speech is not subject to First Amendment protection. The key issue in this case is whether Detective Tosfred, when he raised with a deputy prosecutor his concerns about a case against his informant, spoke as a police detective or as a private citizen. So I'm going to ask you the question that I asked your opponent. Is this a case where the facts are disputed or whether the facts are settled and we're just trying to figure out what they legally mean? I think there are some narratives being pressed by Detective Tosfred on appeal that we would dispute. They're just not supported in the record. The facts in the record all go in one direction, and there can be no genuine dispute on this record. And I would also note in terms of it's very important to look at what are the burdens here. Who has which burdens? And I point the Court to the Coombs case, which is very similar to this case. It's on the same element from the five-factor Eng test in terms of employee speech, and it's on summary judgment, very similar posture. And there this Court made clear that the defendant in that situation can do either of two things. One, present evidence showing that the plaintiff did not speak as a private citizen and instead spoke as an employee. Or two, point to the dearth of evidence and say the plaintiff has not met their burden here. Either way, then the burden shifts to the plaintiff to come forward with their evidence from which a jury could conclude that they spoke as an employee. So the burden is on Detective Tosfred here to create a genuine dispute of material fact. And our contention is looking at the record, not the narratives that are being stated on appeal, but the actual factual record. It all goes in one direction, and there can be no genuine dispute. Well, except for he's disciplined for this and told that this is not your job to do this. So that seems like a hard fact for you to deal with. I mean, if you're saying, oh, he's not – legally, we want him – we want to say that he's speaking in the context of his job, but at the time he was disciplined for speaking outside the context of his job. True, Your Honor. It's a good point. And so there's sort of – there's a nuance here between – so in terms of whether you're speaking as an employee, you're looking at the duties, you're looking at the context of the conversation, the surrounding circumstances, you're looking at the substance of the conversation. When you get reprimanded for, in the conversation, going outside of what you're supposed to be doing and maybe even saying something that is inappropriate and contrary to the desires of the employer, that doesn't take the whole conversation out of your role as an employee. And a couple cases really useful on that point, there's the Olson case that we cite in our brief that was talking about Dahlia and clarifying exactly this point that just because you go outside of what the employer wants doesn't mean you were speaking as a private citizen. You still have to look at the context of the conversation. With respect to what Tuls Rudd told the prosecutor, Cruz, what part of that was knowingly false, misleading, or malicious? Did he tell Cruz something that was not true? The key disputed part, which I think actually goes to the end of my other answer, which is that he went a step beyond just having a conversation about a case when he accused another officer of being untruthful. That's really what caused all this other kind of fallout. In terms of whether or not that was knowingly false or not, there's an issue about that. And then the chief in the reprimand letter said, I find you violated this policy. I found that the accusation part was reckless. So then there's a question of does that meet the knowingly standard or not. And then in deposition, the chief explained that he felt that part was reckless. And then the further back and forth within the internal affairs review process, there were knowing misleading statements, things of that nature. Can I just follow up on that? Because I was very confused about what was actually untrue about what he said. The position was, the concern was that Corporal McCullough, who did the report, was not being untruthful. He wrote what he thought he should write. He wrote this is what happened. He did not include a particular background fact in terms of how he got the information he relied on. The information he relied on was. He wrote a report. Yes. Which said he pulled the CI over and then discovered that he had an expired license. Correct? No. No. He was in the parking lot. He found this vehicle. He searched the plates, discovered that there was an expired suspended license. But he knew that before. He did not know that there was a suspended license. He knew that this person might have had weapons, which comes later. And this is the key difference. And we cite a Washington State authority on this point called Areola, where you can have some uncorroborated tip. You get information about an actual violation, which is the suspended license, right? And then you pull someone over for that. That's okay. If your reason for pulling them over is the suspended license. If what Toldrud told Prosecutor Cruz was materially false, malicious, reckless, why did he decide to dump the case? Again, it goes back to the accusation. And there's actually a page of the prosecutor's deposition in the record where he explains this. It seems to me that Prosecutor Cruz did exactly the right thing. Something has been told me that's discoverable to the defense in the event of a criminal trial that's at odds with what the arresting officer reported. Correct? I think the gist of that is correct. They're at odds. I would just take issue with it. He did exactly the right thing. Cruz said there's been an accusation here. I'm not proceeding with this case as a result of it, regardless of how this would shake out. I thought he also said that what Toldrud had told him was now discoverable to the defense in the event of a criminal trial. Am I wrong about that? I don't recall. There are two sources where the prosecutor speaks about what's going on here and why he kicked the case. One is a deposition testimony, and that's not referenced. The reason is the accusation was made, and there's no point in continuing. Nothing else matters. It was basically the message that Cruz gave. Then there was one other place where he wrote a memo, a one-page memo, explaining what had happened here. He said he got information. There was an accusation. So, again, we're back to the accusation. And he said there it looked like a pretext stop is how he described it, and so not continuing with the case. I do want to take a step back, though, and say all of these issues, while notable and, you know, worthy of discussion, don't or are not dispositive of the issues before this Court, right? And in terms of the core issue of is this First Amendment retaliation or not, it's a square peg in a round hole. The speech and what happened, the discussion with the prosecutor, that's within the duties of a detective to speak with a prosecutor. Can I ask, there seemed to be a dispute. My understanding and opposing counsel said that the statement about he went to Cruz to see if he could save his own cases. Right. And that that's, that in actuality, he was talking, that statement was in the context of another meeting. So what's the situation? I point the Court to ER 179. I don't think that's an accurate. I just have to figure out what ER 179 means. Sorry. Excerpts of record. So the excerpts of record that. I know. Okay. Yeah. That Detective Toffsford submitted. Okay. It has a back and forth from the IA review that they submitted into the record. And I'd also say, you know, ER 95, Detective Toffsford says, what I said in the IA review are the facts that I knew about. And he relayed that. And so at that page, this is the one place in the record where Detective Toffsford is addressing why he had the conversation with the prosecuting attorney, he says, to salvage my cases. That's the heart of his work. That's a work conversation. I just want to sort of highlight some other key facts. Can I ask about one more fact thing? Yeah. Is there any dispute that there wasn't a, that when he went to Cruz, there was no general discussion about PAC? You agree with that? Yes. There's a page in the record where I think it's, I have to look at that. But there's a page in the record where there's a question, you know, did you raise concerns about the PAC team with the prosecutor? And there's an initial response, and then the follow-up kind of clarifies, they didn't talk about any other specific concerns that the detective had. It was the PAC team came up in discussion of the informant's case, which is, again, the detective's work. But there was no pivoting to other topics. Before I forget, I do want to point the Court to Coombs, where there was a teacher that was talking with parents. And this is, again, the level of abstraction, right, in terms of the duties. A teacher had a discussion with parents. The teacher, as the Court recognized in Coombs, at page 1264, Penn State 1264, this is 816 F3D 1264, the Court noted that in that discussion, the teacher relayed things and made comments that they had been ordered not to say and were against the wishes of the employer. That doesn't take that conversation out of employment. The whole point is when you're having a conversation in employment and you take it somewhere it shouldn't go or do it in a way you shouldn't be doing it because your employer has told you to do it a different way, that is not subject to First Amendment protection. Again, there may be other rules and laws that apply, but the heart of this conversation is a work conversation, and it's Tossard speaking as a detective, not as a private citizen trying to do something else more broadly. It's a detective and prosecutor. The other key part here is, and some of what was said I don't think is reflected in the record in terms of the duties and the back and forth. I just want to really highlight key points on this. The duties are reflected at ER 86 to 87 from Detective Tossard, talking about how he testifies, he reviews police reports in his role. There is a formal jobs description in the record at SER 18, talking about working with other law enforcement agencies. There's testimony about how detectives and other officers communicate with prosecutors regularly, as other courts have recognized. There's also evidence showing that Detective Tossard was having conversations with Deputy Prosecutor Cruz over time about his informant. This particular conversation took place in the course of that stream of discussion, all of which was about the work. And there's no dispute that that's the context here. It was work discussions for work, for his purposes as a detective. Judge Forrest, you asked about the, you know, does the purpose matter? And again, that's the one place where it's addressed. And I submit that it would be a relevant factor. It's not dispositive. It's a practical inquiry. There's a number of factors, but it's relevant. I'd point the Court to the footnote 13 in the Dahlia case, where the Court cited other factors that courts have looked at. One is the impetus for the conversation. And if his intent is relevant, isn't this necessarily a jury question? It would be if there were evidence from which you could draw inferences in either direction. But as I say, the only part of the record where Tossard addresses this, it's a very clear singular statement where he's asked point blank, why did you have this conversation with the deputy prosecutor? Response, I told you, to salvage my cases, period. There's no other evidence. And again, the burden is on Detective Tossard at this stage to put forth evidence to overcome that from which a jury could look and say, oh, well, maybe that wasn't why. But there is no such evidence in this record. That's the one spot as to that one factor, I'd say. And then, Your Honor, the other piece is even if there were a dispute about the intent, maybe that wasn't his intent. He meant something else. All the other factors that you look at in this record are overwhelming. And that would – so, again – Except for your clients said he did this outside the scope of his job. Well, this – not necessarily having a conversation with the deputy prosecutor about your job, about your cases with your informant, but going further and saying, I think this officer was untruthful. But then I go back to Coombs where you have the conversation with the parents about the districts, about the general subject of what your work is and what you're expected to talk to parents about, which is the educational program. Then in that conversation, you go a step further and start saying the district's doing a bad job. This is – that's not good. This isn't good, as the district has told you not to do. That's still employee speech. So, otherwise, any time there's discipline, the answer is, well, I did what you didn't want, so I was doing it on my own. You told me not to do it, so it wasn't my job. I was doing that as a citizen. And then, as the court in Garcetti said, we can't have the courts coming in and supervising every act of discipline that relates to speech, which is where that sort of line would go. But in terms of the factors, so we've got the duties. I mentioned the duties. We've got the reason he admitted. There's surrounding circumstances here. The supervisor said, yeah, go ahead, have that conversation. And, Your Honor, Judge Forrest, it goes back to the point about later he was told you went – you shouldn't have done this, but in terms of just having a conversation about some concerns. I'm just told you shouldn't have done this. He was told that what you told Cruz was reckless, false, misleading, knowingly so. Yes, that the corporal was untruthful. Isn't that a fact question? Well, that's not the issue before the court. So is – sorry, Your Honor, is what a fact question? I apologize. Isn't that a fact question, whether what he told Cruz was truthful? I don't – well, I – Is he being punished for having told Cruz the truth? Not – it's not at issue in this case because we don't get to that. That would maybe be relevant in balancing, for example. You don't get to that here because it's employee speech. And, again, there may be other legal provisions that apply. Those aren't at issue here. We have here an attempt to force this situation into a First Amendment framework, where it does not belong, is really what's going on here, Your Honor. And so, in sum, the burden was on Detective Foster to create a genuine dispute of material fact as to this one element of the nature of the speech. That did not happen. The evidence is going in one direction. Not only is there an absence of any evidence showing speech is a private citizen, but all the record goes in the other direction. And so the district court was correct in granting summary judgment to defendants. I guess something just occurred to me. Yeah. Your position is the only evidence of his intent is his statement that he went to the DA to save his cases. One of the factors that we have to consider under our case law – I think Dahlia sets these out – is the content of the speech. The content of the conversation with the DA wasn't about saving the cases. It was about this problem that the detective had noticed. So does that create a fact question? The content of the speech and his stated intent don't really jive. I think there's a match there, because the discussion about the concerns with the case against the informant implicate the cases in which the informant is involved. That's the issue, right? This informant's getting dragged into a criminal process. That's going to have secondary effects, spillover effects, if you will, on the detective's cases. And so when he's going to the – I thought you said – I mean, it was your adversary that said this – that by the time he has the conversation with the DA a few weeks later that those cases had all been figured out. Thank you for raising that, Your Honor. There's nothing in the record suggesting that. In fact, the contrary is reflected in the record. There's a narrative, for example, description of what happened. I'd point the Court to ER 87 and 281 that you sort of get a flavor for what happened here. I also mentioned that there were discussions with the prosecutor both before and after this particular conversation. And you can see that at ER 281, ER 92, and then more broadly at ER 260 to 61. So if you look at those, there was no, oh, I got rid of all the cases, I had nothing to do with this anymore, I was just going as a concerned citizen. There's nothing in the record about that. To the contrary, the record shows the weeks were spent looking at the situation, evaluating the cases the informant was involved in, then having a discussion with the informant about that. This concern was raised about, well, how did this officer find me? And then there was reviewing the materials and seeing if there was a discrepancy, and then going to the prosecutor. By this point, and I think opposing counsel said some cases were still going, if I heard the comments correctly. But again, the record doesn't reflect any abandonment of cases. And then, sorry, just to finish this up, the record reflects that after this particular conversation at issue, Detective Tostrad went back to the prosecutor to talk more about the informant's cases, canceling the contract, what's going to happen now. So again, this is just part of an ongoing discussion of him managing his work. If he did it in a way that was improper, that doesn't take it, that doesn't put it into the First Amendment. Any other questions? Thank you, counsel. Thank you. All right. We'll put two minutes on the clock for rebuttal. He had a duty to manage his cases, there's no question. He did not have a duty to report to Cruz what he had found. That was not in any written form of any duty anywhere. We know this for a fact because he was reprimanded for exercising that decision to go to Cruz. That was the basis of his reprimand, do not whistle blow. And then they create this impression that he has been false about it and reckless and irresponsible, none of which is borne out by the record. Next. If you look at page 179, which counsel has cited three times to you as being definitive on the issue, look at that exchange and you will see that he keeps referring to the informant to make sure we didn't violate his rights by going and contacting him without his attorney. That attorney section's up half a page. I don't know why he said he was clearing out his cases with Cruz, but he goes on to talk not about clearing the cases but the fact that he had to meet with the CI. That's what he's answering. We also know that Pruninger clearly said that we had to do something but he wasn't willing to do it. And Pruninger, by the way, was also reprimanded for not supervising Tosford correctly. All in all, there are disputed facts as to what his motive was, what the content of the conversation was, and they dispute it and say this was all for his personal interest. That does not show anywhere that it's personal interest or solely interest in reviving or somehow saving cases. That informant was washed. He's gone. There's nothing to save. What he has to do is figure out, does he have other ways to prove those cases? Well, the agreement terminating the relationship between the officers and the CI happened after the conversation with the DA, right? They might, but we don't know that in this record. I thought that was in the record. We don't know what happened to the CI following it. I agree that is one of the obligations. I don't know that it was done or not. That's not in the record, whether he was compensated. The case was dismissed on pretext grounds, and as Judge Hawkins pointed out, that's entirely correct. But what Lonnie Tosford did cannot change what his duties are. His duties are determined before that day the sun even rises. He went on his own emphasis because he was tired of the packed games. His supervisor was so fed up he wasn't even going to report it. Okay. Any further questions? We understand your argument. Thank you. Thank you.
judges: HAWKINS, FORREST, Restani